IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| H. Dewain Herring, | ) | C/A No.  0:11-160-MBS-PJG |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Robert M. Stevenson, III, *Warden Broad River* | ) | |
| *Correctional Institute*, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

The plaintiff, H. Dewain Herring ("Herring"), a state prisoner who is represented by counsel, filed this habeas corpus action pursuant to 28 U.S.C. § 2254.  This matter comes before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC for a Report and Recommendation on the respondent's motion for summary judgment.  (ECF No. 17.)  Herring filed a response in opposition.  (ECF No. 26.)  Having carefully considered the parties' submissions and the record in this case, the court concludes that the respondent's motion for summary judgment should be granted.

## BACKGROUND

Herring was indicted in February 2006 in Richland County for murder (06-GS-40-914) and pointing and presenting a firearm (06-GS-40-881).  (App. at 2-7; ECF No. 4-1 at 16-21.)  Herring was represented by Richard A. Harpootlian, Esquire, Graham Newman, Esquire, and Jamie Lindler, Esquire.  The trial court conducted a suppression hearing on May 2, 2007 during which Herring, through counsel, challenged the propriety of a search warrant.  On May 7 through May 21, 2007, Herring was tried by a jury and found guilty as charged. (App. at 1318; ECF No. 5-15 at 8.)  Herring was sentenced by the circuit court to thirty years' imprisonment for murder and five years'

imprisonment for pointing and presenting a firearm, both sentences to be served concurrently.  (App. at 2352; ECF No. 5-15 at 9.)

Herring timely appealed and was represented by Richard A. Harpootlian, Esquire, Graham L. Newman, Esquire, and Katherine Carruth Goode, Esquire, who filed a brief on Herring's behalf that raised the following issues:

1.    Did the trial court err in denying the defense motions to suppress the three searches of appellant's residence and the fruits of those searches?

2.    Did the trial court abuse its discretion in allowing lay witnesses to give their opinion of what could be seen on the video, when those witnesses did not personally observe the actual events depicted in that portion of the video?

3.    Did the trial court abuse its discretion in denying the defense mistrial motion based on the admission of improper lay opinion testimony?

4.    Did the trial court commit reversible error in denying the requested charge on accident?

5.    Did the trial court commit reversible error in denying the requested charges on involuntary manslaughter based on negligent use of a deadly weapon?

6.    Did the trial court commit reversible error in granting the State's request to charge based on State v. Mouzon?

7.    Did the trial court err in denying the motion for directed verdict with respect to the charge of pointing and presenting a firearm?

8.    Was the cumulative prejudice that resulted from all the erroneous rulings such that appellant is entitled to a new trial?

(ECF No. 1-4 at 7.)  Because one of Herring's issues on appeal involved a challenge to the authority of the Chief Justice of the South Carolina Supreme Court regarding the issuance of an administrative order that altered the manner in which search warrants are obtained in Richland County as well as the validity of the administrative order itself, on June 16, 2009 Herring filed a motion for the Chief



Justice to recuse herself from participating in the appeal of his conviction and sentence. (ECF No. 1-8.) Herring's motion was denied on June 18, 2009. (ECF No. 1-9.)

The Supreme Court heard oral argument on June 23, 2009. By order issued December 21, 2009, the Court affirmed Herring's conviction and sentence. State v. Herring, 692 S.E.2d 490 (S.C. 2009); (ECF No. 1-10). Herring filed a petition for rehearing on January 20, 2010, in which he requested that (1) the Court rehear his case and address the remainder of his issues on appeal; and (2) the Court apply the recent decision in State v. Belcher, 385 S.C. 597 (2009), to his case, which had been pending on direct review when the Court's opinion in Belcher was issued. (ECF No. 1-11.) Herring's petition also renewed his request that the Chief Justice recuse herself from considering his petition for rehearing. The South Carolina Supreme Court denied by letter order Herring's petition for rehearing on May 14, 2010. (ECF No. 1-12.) The remittitur was issued May 14, 2010. (ECF No. 1-13.)

On June 4, 2010, Herring filed a *pro se* application for post-conviction relief ("PCR"), which is currently pending in the Richland County Court of Common Pleas.[1]

### SUMMARY OF TRIAL EVIDENCE

In considering Herring's appeal, the South Carolina Supreme Court summarized Herring's criminal proceedings as follows:

> Herring was charged with the January 29, 2006 shooting of an employee of Chastity's Gold Nightclub (Chastity's), a strip club in Columbia. The facts giving rise to the shooting are as follows.
> After golfing in Aiken with friends on the day of January 28, 2006, at which he had consumed numerous beers, Herring stopped by a bar for a few drinks on the

---

[1] All of the issues raised in the instant Petition address direct review, not collateral, issues. It appears that Herring has chosen to seek habeas review of those issues before exhausting his collateral issues. See 28 U.S.C. § 2244(b)(2) (discussing requirements for authorization to file second or successive habeas corpus applications).



way home, and then returned home around 7:30 p.m. Herring had a couple more drinks at his home with a golfing buddy before the friend left. Herring laid down intending to go to sleep, but got up and decided to go a Forest Acres restaurant. When the restaurant was closed, Herring changed his mind and went to Platinum Plus, a Columbia strip club. He had a drink and paid a dancer for a lap dance and left Platinum Plus. On his way home, he decided to stop by Chastity's on River Drive; he arrived shortly after 11:00 p.m. According to Herring, he ordered a drink at the bar, but he has very little recall of any events for several hours thereafter.

According to witnesses and employees of Chastity's, Herring purchased a drink and paid for a $30.00, three minute lap dance from a dancer named Mia. After the lap dance, Herring paid Mia for a $300 dance in what was known as the Champagne room.

Mia took Herring to the Champagne room and told him to wait while she went to freshen up. A bouncer, Carl Weeks, went to check on Herring a few minutes later and found him naked and masturbating on the sofa. The bouncer told Herring he could not do that and told him he would have to leave. When Herring did not move, the bouncer got the manager, John Johnson (John John). When they returned, Herring was dressed. Weeks told Herring he would either have to leave, or they would call police and have him arrested for solicitation of prostitution. According to Weeks, Herring responded, "No. I will fucking shoot you." John John and a bouncer named Donnie Hawkins escorted Herring to the front door at 11:57 p.m. John John walked outside with Herring and used a two-way radio to call Herring's license plate number out to Weeks, who was standing in the doorway, as Herring drove away. Weeks and Hawkins watched as Herring backed up his black SUV, and fumbled with his glove compartment with his right hand. Herring slowly pulled away, putting down the passenger side windows as he went. Hawkins, Weeks and John John had just gone inside when they saw Herring's vehicle coming back down River Drive toward Chastity's. According to Hawkins, John John was right inside the door. Hawkins saw a flash of light come from the side of the vehicle, and heard John John say, "Oh shit!" John John fell to the floor, having been hit in the left ear by a bullet which came through the front door. He died a short while later at the hospital.

Upon arriving at the scene of Chastity's, police were given Herring's license tag number, which was registered to his office address in Columbia. Police patrolled the office parking lot, but did not find the vehicle. They then determined Herring's home address and went there at 2:10 a.m. on January 29, 2006. A police officer, seeing a light on in the garage, peeked in the garage window to see if the suspect was there. Although the suspect was not there, the officer did see the vehicle, which they realized was Herring's. They knocked on the door and rang the doorbell several times and, receiving no answer, they returned to the police station and obtained a search warrant for the home.[2]

---

[2]     Several officers remained outside the premises while the warrant was obtained.



Police went back to Herring's residence at approximately 4:00 a.m. to execute the search warrant. They rang the doorbell several times but received no answer. They entered forcibly, announcing they were police with a search warrant. Officer Linfert testified that he saw Herring in the hallway and recognized him from the photo on his driver's license. Linfert told Herring to get down on the ground, but Herring ran back down the hall toward a bedroom. He followed Herring to the bedroom, and saw Herring pull a gun from a nightstand and point it in his direction. Officer Linfert yelled at him to drop the gun and then fired one shot at him. Other officers also opened fire, and Herring was hit in the arm. Herring called 9-1-1 and told them he believed there were intruders in his home. After talking with the 9-1-1 operator, Herring surrendered upon realizing the "intruders" were indeed police officers.

Herring initially told police he had not left the house after returning home from Aiken; he did not recall going to Chastity's. When police told him of the video tape which showed him entering and leaving Chastity's, he remembered only being at the bar, having a drink, and a gunshot firing; the next memory he had was of police bursting into his home. He subsequently began remembering more details, such as paying for a lap dance from a light skinned black woman.

Bullet fragments removed from John John's head conclusively matched a .357 Magnum Ruger owned by Herring; the Ruger was found under some clothing in his bedroom closet during a SLED search of the home.[3]  Gunshot residue was found on the passenger side of Herring's vehicle. A jury convicted Herring of murder and pointing and presenting a firearm.

(ECF No. 1-10 at 2-4); see also Herring, 692 S.E.2d at 491-92.

## FEDERAL HABEAS ISSUES

In Herring's federal petition for a writ of habeas corpus, he raises the following issues:

[a].    Petitioner Herring's Due Process Right To A Fair Trial Was Denied Because The Jury Instructions Equated The Mental State Required For A Conviction of Murder With the Same Mental State Necessary For The Lesser Included Offense of Involuntary Manslaughter, Thereby Allowing The Jury To Find Petitioner Guilty Of Murder Even If Petitioner Possessed The Mitigating State of Mind For Involuntary Manslaughter[;]

[b].    Petitioner'[s] Due Process Rights To A Fair Trial Were Denied Because The Jury Was Not Instructed On The Defense of Accident Nor Provided Instructions Pertaining To The Negligent Use of A Firearm[;]

---

[3]    [The South Carolina Law Enforcement Division ("SLED")] searched the residence relative to the shooting which occurred between police and Herring at the time of Herring's arrest.



[c].   Petitioner was denied his right to Due Process as a result of the South Carolina Supreme Court's decision to refuse to apply its decision in State v. Belcher, [385] S.C. [597], 685 S.E.2d 802 (2009)[,] to the Petitioner as required by Griffith v. Kentucky[,] 479 U.S. 314 (1987);

[d].   Petitioner was denied his right to Due Process as a result of the refusal of the Chief Justice of the South Carolina Supreme Court to recuse herself from participating in the appeal from Herring's conviction which necessarily involved a direct review of the legality of the Chief Justice's Administrative Order;

[e].   Petitioner was denied his right to be free from unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution and Petitioner was further deprived of his right to fully and fairly litigate this Fourth Amendment claim in the South Carolina state courts as a result of the refusal of the Chief Judge to recuse herself from participation and the Court's refusal to apply the correct and controlling legal standard applicable to Fourth Amendment claims[.]

(Am. Pet., ECF No. 13 at 7.)

## DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party.



See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.  The moving party has the burden of proving that summary judgment is appropriate.  Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(c), (e); Celotex Corp., 477 U.S. at 322.

**B.    Habeas Corpus Standard of Review**

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), claims adjudicated on the merits in a state court proceeding cannot be a basis for federal habeas corpus relief unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as decided by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(1), (2).  When reviewing a state court's application of federal law, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams v. Taylor, 529 U.S. 362, 410 (2000); see also Harrington v. Richter, 131 S. Ct. 770, 785 (2011); Humphries v. Ozmint, 397 F.3d 206 (4th Cir. 2005); McHone v. Polk, 392 F.3d 691 (4th Cir. 2004).  Moreover, state court factual determinations are presumed to be correct and the petitioner has the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 131 S. Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Under the AEDPA, a state court's decision "must be granted a deference and latitude that are not in operation" when the case is being considered on direct review. Harrington, 131 S. Ct. at 785. Moreover, review of a state court decision under the AEDPA standard does not require an opinion from the state court explaining its reasoning. See id. at 784 (finding that "[t]here is no text in [§ 2254] requiring a statement of reasons" by the state court). If no explanation accompanies the state court's decision, a federal habeas petitioner must show that there was no reasonable basis for the state court to deny relief. Id. Pursuant to § 2254(d), a federal habeas court must (1) determine what arguments or theories supported or could have supported the state court's decision; and then (2) ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of the United States Supreme Court. Id. at 786. "If this standard is difficult to meet, that is because it was meant to be." Id. Section 2254(d) codifies the view that habeas corpus is a " 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).

**C.      Respondent's Motion for Summary Judgment**

**1.      Jury Instructions for Murder and Involuntary Manslaughter**

Herring first alleges that the trial court's jury instructions on murder and involuntary manslaughter violated his right to due process of law. Herring argues that the jury instructions described the same mental state for murder and involuntary manslaughter, which allowed the jury

to convict Herring of murder even if he "possessed the mitigating state of mind described in the instructions for involuntary manslaughter." (Am. Mem. Supp. Pet., ECF No. 13-1 at 17.)  Herring summarizes this ground as asserting that "the jury instructions did not differentiate between the degrees of recklessness required to prove malice for the murder charge from the degree of recklessness that would support a finding of the lesser offense of involuntary manslaughter." (Petr.'s Resp. Opp'n Summ. J. at 5, ECF No. 26 at 5.)

When a petitioner argues that he is entitled to federal habeas relief based on an improper jury instruction, the court must be mindful that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Middleton v. McNeil, 541 U.S. 433, 437 (2004).  Further, " '[a] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " Id. (quoting Boyde v. California, 494 U.S. 370, 378 (1990)).  The defendant must demonstrate "that there was a 'reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." Waddington v. Sarausad, 555 U.S. 179, 191 (2009) (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)).  There must be more than "some 'slight possibility' that the jury misapplied the instruction" and the relevant question is " 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' " Waddington, 555 U.S. at 191 (quoting Estelle, 502 U.S. at 72).  Finally, as stated above, when a petitioner challenges a state court's application of federal law, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams, 529 U.S. at 410.

In this case, the trial judge instructed the jury on both murder and involuntary manslaughter. After explaining to the jury the requirements of criminal intent, the trial judge provided a lengthy charge on murder followed by an instruction on involuntary manslaughter. Herring's trial counsel objected to the court's inclusion of a <u>Mouzon</u>[4] charge as part of the murder charge, arguing that the <u>Mouzon</u> case is from 1957;[5] that the charge is burden shifting; that the recklessness provision has been subsumed by the involuntary manslaughter statute; and that if the charge is constitutional, there was no factual basis for the charge. Trial counsel asserted that including recklessness in the manslaughter and murder charge would confuse the jury. (ECF No. 5-13 at 29-30.) The trial judge rejected trial counsel's argument.

The pertinent portion of the trial court's jury charge as to murder, with an emphasis on the <u>Mouzon</u> language, stated as follows:

> Malice is defined in the law of homicide as a term of art; that is, a technical term importing wickedness, excluding just cause or legal excuse. *An old South Carolina case says that malice does not necessarily impart ill will towards the individual injured but signifies rather a general malignant recklessness of the lives and safety of others or a condition of mind which shows a heart regardless of social duty and fatally bent on mischief.*

(ECF No. 5-14 at 35-36) (emphasis added).[6] By contrast, the relevant portion of the involuntary manslaughter charge at issue stated:

> Involuntary manslaughter is the killing of another without malice and unintentionally while engaged in either an unlawful act not amounting to a felony and not naturally

---

[4] <u>State v. Mouzon,</u> 99 S.E.2d 672 (S.C. 1957).

[5] The court notes that the <u>Mouzon</u> instruction was upheld by the South Carolina Supreme Court in a 2006 case. <u>See</u> <u>Herring</u>, 692 S.E.2d at 497 n.7 (citing <u>State v. Reese</u>, 633 S.E.2d 898, 902 (S.C. 2006), <u>overruled on other grounds by</u> <u>State v. Belcher</u>, 685 S.E.2d 802 (S.C. 2009)).

[6] This paragraph is only a portion of the malice instructions provided to the jury as part of the murder charge. (<u>See</u> ECF No. 5-14 at 36-37.)



tending to cause death or great bodily harm; or, a lawful act with reckless disregard for the safety of others.

Unintentional means the defendant did not intend for anyone to be killed or seriously injured.

Reckless disregard for the safety of others is more than mere negligence or carelessness. Mere negligence or carelessness is the failure to use care that a person of ordinary reason would use under the same circumstances.

Recklessness is a conscious failure to use ordinary care. A reckless disregard for the safety of others means that you not interested in the consequences of your acts or the rights and safety of others. If a person who knows or should know that ordinary care requires certain precautions be taken for the safety of others when using a dangerous instrumentality such as a gun or a car but that person fails to use those precautions without concern, the person's actions are considered reckless.

(ECF No. 5-14 at 38-39.)

On appeal, Herring raised several challenges to the Mouzon charge. His due process argument first alleged that the language is unconstitutionally vague because there is no means to differentiate between recklessness as it was used in the involuntary manslaughter charge and the recklessness required to elevate the offense to murder. Herring also argued that the Mouzon charge unconstitutionally shifted the burden of proof for the defendant's mental state to the defendant. (ECF No. 1-4 at 46-47.) The South Carolina Supreme Court summarily rejected Herring's challenge to the Mouzon charge, stating the following:

The remaining issues are affirmed pursuant to SCACR Rule 220(B)(1) and the following authorities: . . . Issue 6 (State v. Mouzon instruction) – State v. Reese, 370 S.C.[ ]31, 633 S.E.2d 898 (2006) (upholding Mouzon instruction); Battle v. State, 382 S.C. 197, 675 S.E.2d 736 (2009) (in determining prejudice[] from jury instructions, court must find that, viewing the charge in its entirety and not in isolation, there is a reasonable likelihood that the jury applied the instruction in a way that violates the Constitution).

(ECF No. 1-10 at 14); see also Herring, 692 S.E.2d at 497 n.7.



In his Amended Petition, Herring argues that the South Carolina Supreme Court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as decided by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Relying on a case from the United States Court of Appeals for the Seventh Circuit, Herring alleges that he was deprived of his recklessness defense because the jury was not instructed "that it could *not* convict Herring if it found that Herring engaged in 'a lawful act with reckless disregard for the safety of others' " and because the jury was instructed that "it had to find malice, the essential element of murder, if he acted with a 'general malignant recklessness of the lives and safety of others.' "[7] (ECF No. 13-1 at 19-20.)

As an initial matter the court notes that "it is Supreme Court precedent, and not [] [c]ircuit precedent, to which we look in applying the AEDPA standard of review." Bustos v. White, 521 F.3d 321, 325 (4th Cir. 2008) (citing Williams, 529 U.S. at 381-82, 390 n.15). Herring has identified no United States Supreme Court case unreasonably misapplied by the South Carolina Supreme Court on this issue. Moreover, in any event, the Seventh Circuit case does not support Herring's Petition. The Seventh Circuit in Falconer v. Lane, 905 F.2d 1129 (7th Cir. 1990), found that a trial court's jury instructions on voluntary manslaughter and murder resulted in explicit misdirection to a level

---

[7] In Herring's response in opposition to the respondent's motion for summary judgment, he also appears to argue for the first time that the trial court erred in including the word "or" between the phrases "a general malignant recklessness of the lives and safety of others" and "a condition of mind which shows a heart regardless of social duty and fatally bent on mischief." (See ECF No. 25 at 6-7.) The court finds that this argument is not properly before the court. See, e.g., Bridgeport Music, Inc. v. WM Music Corp., 508 F.3d 394, 400 (6th Cir. 2007) (holding that a party may not expand its claims to assert new theories in response to summary judgment); White v. Roche Biomedical Labs., Inc., 807 F. Supp. 1212, 1216 (D.S.C. 1992) (noting that "a party is generally not permitted to raise a new claim in response to a motion for summary judgment").



that violated the constitutional guarantee of due process. In summarizing those instructions, the court stated that

> [t]he jury was told that to sustain a charge of voluntary manslaughter the State had to prove either that the defendant "acted under a sudden and intense passion resulting from serious provocation by another" or that the defendant held an unreasonable belief that circumstances existed which would have justified the killing. The jury was also given the elements necessary to sustain a charge of murder, which did not specifically include the "manslaughter defenses" of provocation or unreasonable belief of justification. Finally, to avoid a murder conviction, a defendant must have "reasonably" believed that the use of force against the decedent was necessary to defend herself against "the imminent use of unlawful force."
>
> In order to return the murder verdict, then, the jury was required to find that the petitioner was not completely justified in using the deadly force that she used. Yet the jury was not told that if it found that she had acted with some lesser level of justification it could not convict her of murder.

Falconer, 905 F.2d at 1133. The court further noted that "the Illinois Supreme Court held in a separate, consolidated case that it was 'grave error' to give instructions identical to those given at petitioner's trial." Id. at 1131.

The court finds that unlike those found to be deficient in Falconer, the jury charges at Herring's trial did not result in explicit misdirection. Rather, contrary to Herring's assertions, the instructions at issue here distinguish between the "*malignant*" recklessness required to sustain a murder charge, more specifically described as "a condition of mind which shows a heart regardless of social duty and fatally bent on mischief," and the "reckless disregard for the safety of others" associated with involuntary manslaughter, described as being "not interested in the consequences of your acts or the rights and safety of others." (ECF No. 5-14 at 35-36, 38-39.) Moreover, reading the charges as a whole (see ECF No. 5-14 at 26 through ECF No. 5-15 at 6), the court finds that the South Carolina Supreme Court did not err in finding no reasonable likelihood that the jury applied the instruction in a way that violates the Constitution. See Herring, 692 S.E.2d at 497 n.7; see also



Waddington, 555 U.S. at 191.  Thus, Herring has failed to demonstrate that the South Carolina Supreme Court unreasonably misapplied clearly established federal law in rejecting Herring's argument that the Mouzon charge violated his right to due process.  Accordingly, Herring is not entitled to federal habeas corpus relief on this ground.

### 2. Jury Instructions for the Defense of Accident and for the Negligent Use of a Firearm

Herring next argues that the trial court's failure to charge the jury on the defense of accident or to include charges referencing the negligent use of a firearm charge in the trial court's involuntary manslaughter charge violated his right to due process.

Trial counsel requested that the court charge the jury on the defense of accident, arguing that since the defendant possessed a concealed weapons permit, he had a lawful right to have the weapon out in his car.  Contrarily, the solicitor argued that the defendant did not have a right to have it out in the parking lot, waiting; that the defendant failed to exercise due care with it; and that the defendant had allegedly been drinking all day.  (See ECF No. 5-13 at 8-9.)  The trial court denied the requested charge, stating that such a defense "is only allowable when the defendant is involved and engaged in a lawful act."  (ECF No. 5-13 at 7-8.)

Trial counsel also requested that the trial court include in its involuntary manslaughter charge that "[o]ne who causes the death of another by the negligent use of a deadly weapon or instrumentality may be convicted of involuntary manslaughter."  (ECF No. 5-16 at 25) (quoting State v. Brown, 32 S.E.2d 825, 827 (S.C. 1945)).  Trial counsel further requested that the voluntary manslaughter instructions include the following:

> How do you, gentlemen, as jurors, think that a man of average sense in this position would handle a dangerous weapon or implement, under given circumstances generally? Then, under the testimony of the case you are trying, has the state shown



> beyond a reasonable doubt that the defendant was guilty of negligence—that is, he did act in that manner with the dangerous weapon or implement as a man of average sense and disposition, under the circumstances which the testimony shows to have existed in the case—he did act in that way, and, as a result of that, he did inflict the mortal wound, as alleged in the indictment, which caused the death of the defendant, as charged, if you find it so, then that will be a case of manslaughter.

(ECF No. 5-16 at 27) (quoting State v. Gilliam, 45 S.E. 6, 7 (S.C. 1903) and State v. Quick, 167 S.E. 19, 21 (S.C. 1932)).  However, during discussions with the trial judge, trial counsel stated that the shorter charge from Brown is essentially a modern summary of the longer charge from Gilliam and Quick and that the defendant would be satisfied if just the shorter charge were included.  (ECF No. 5-12 at 37-38; see also ECF No. 5-13 at 4.)  Trial counsel argued that such a charge was warranted because the murder charge stated that one can infer malice from the use of a deadly weapon and, therefore, the jury should also be told that negligent use of a deadly weapon is involuntary manslaughter.  (ECF No. 5-13 at 2, 3.)  The solicitor argued that the trial court's charges accurately stated the law and appeared to argue that the additional charge would be a charge on the facts, which the parties could argue to the jury.  (See ECF No. 5-13 at 2-3.)  The trial court noted that involuntary manslaughter requires a finding of criminal negligence, which is a reckless disregard for the safety of others, and which was included in the proposed charges.  (Id.)  Ultimately, the court did not include a charge on negligent use of a firearm in its instructions.

The South Carolina Supreme Court summarily rejected Herring's arguments stating the following:

> The remaining issues are affirmed pursuant to SCACR Rule 220(B)(1) and the following authorities: . . . Issue 4 (failure to charge the law of accident) – State v. Burriss, 334 S.C. 256, 259, 513 S.E.2d 104, 106 (1999) (for homicide to be excusable on the ground of accident, it must be shown that the killing was unintentional, the defendant was acting lawfully, and due care was exercised in the handling of the weapon); State v. Burkhart, 350 S.C. 252, 565 S.E.2d 298 (2002) (to warrant reversal, trial court's refusal to give requested charge must be both erroneous



and prejudicial to defendant): Issue 5 (involuntary manslaughter instruction) – McKnight v. State, 378 S.C. 33, 661 S.E.2d 354 (2008) (failure to give requested jury instructions is not prejudicial error where instructions given adequately cover the law).

(ECF No. 1-10 at 14); see also Herring, 692 S.E.2d at 497 n.7.

In presenting their respective positions to this court, the parties argue extensively over the requirements of South Carolina state law with regard to these charges. However, the court notes that "[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). The relevant question before the court is whether the trial court's failure to provide these instructions rose to such a level that it violated Herring's right to due process and that the South Carolina Supreme Court unreasonably misapplied federal law as determined by the United States Supreme Court in finding that it did not.[8] Herring appears to argue that the trial court's failure to provide these charges was sufficiently harmful to make Herring's conviction unfair.

Having reviewed the parties' arguments, the trial testimony, and the charges given by the trial court, the court finds that Herring has not demonstrated that the trial court's failure to issue these jury charges under the circumstances in this case amounts to a due process violation. Cf. Cool v. United States, 409 U.S. 100, 103-04 (1972) (per curiam) (holding that an instruction which "allow[ed] the jury to convict despite its failure to find guilt beyond a reasonable doubt" mandates reversal of the conviction). "Failure to give an appropriate theory-of-defense instruction, without more, is not a violation of the Due Process Clause. Some other circumstances, demonstrating a serious miscarriage

---

[8] To the extent that Herring argued in his direct appeal that his due process rights were violated by failing to include these charges and the South Carolina Supreme Court did not specifically address these arguments, Herring must show that there was no reasonable basis for the state court to deny relief. See Harrington, 131 S. Ct. at 784.



of justice, must be present." <u>Nickerson v. Lee</u>, 971 F.2d 1125, 1138 (4th Cir. 1992), <u>overruled on</u> <u>other grounds by</u> <u>Gray v. Netherland</u>, 518 U.S. 152, 165-66 (1996) (internal quotation marks and citation omitted).  Although Herring argues that his defense of accident was a "highly credible defense," reading the charges as a whole, he has failed to demonstrate that a serious miscarriage of justice occurred and that the South Carolina Supreme Court denied Herring due process in its apparent finding that under state law the trial court did not err in failing to charge accident.  (<u>See</u> Petr.'s Resp. Opp'n Summ. J. at 9, ECF No. 26 at 9.)  Similarly, reviewing the trial court's charges as a whole, Herring has failed to demonstrate a denial of due process in the South Carolina Supreme Court's determination that the trial court's failure to include an instruction in the manslaughter charge concerning negligent use of a firearm did not amount to prejudicial error as it adequately covered the law.  Herring cannot demonstrate that the absence of such language from the manslaughter charge "so infected the entire trial that the resulting conviction violates due process." <u>Waddington</u>, 555 U.S. at 191 (internal quotations marks and citation omitted).  Finally, it does not appear that Herring's trial counsel was precluded from arguing to the jury his position with respect to the gun, specifically that he may have been negligent.  Accordingly, Herring cannot demonstrate that the South Carolina Supreme Court unreasonably misapplied clearly established federal law as decided by the Supreme Court of the United States in rejecting these allegations of error.  <u>See</u> <u>Bustos</u>, 521 F.3d at 325 (stating that "it is Supreme Court precedent, and not Fourth Circuit precedent, to which we look in applying the AEDPA standard of review") (citing <u>Williams</u>, 529 U.S. at 381-82, 390 n.15).

3.     **Application of <u>State v. Belcher</u>**

Herring next argues that the South Carolina Supreme Court denied him due process in refusing to apply its holding in <u>State v. Belcher</u>, 685 S.E.2d 802 (2009), to Herring's case. The parties agree that the <u>Belcher</u> case was decided by the state Supreme Court after briefing and argument before the Supreme Court in Herring's case, but before the Supreme Court issued its decision in Herring's case, and that appellate counsel submitted a letter to the South Carolina Supreme Court prior to the issuance of its decision in this case arguing for the application of <u>Belcher</u>.

The <u>Belcher</u> case held that "the 'use of a deadly weapon' implied malice instruction has no place in a murder . . . prosecution where evidence is presented that would reduce, mitigate, excuse or justify the killing . . . ." <u>Id.</u> at 809. However, the South Carolina Supreme Court specifically stated that "[b]ecause our decision represents a clear break from our modern precedent, today's ruling is effective in this case and for all cases which are pending on direct review or not yet final *where the issue is preserved*." <u>Id.</u> at 810 (emphasis added) (citing <u>Griffith v. Kentucky</u>, 479 U.S. 314 (1987) and <u>Harris v. State</u>, 543 S.E.2d 716, 717-18 (Ga. 2001)).

In issuing its decision in Herring's case, the South Carolina Supreme Court did not directly address this argument; however, as stated above, when no explanation accompanies the state court's decision, a federal habeas petitioner must show that there was no reasonable basis for the state court to deny relief. <u>See</u> <u>Harrington</u>, 131 S. Ct. at 784. Further, pursuant to § 2254(d), a federal habeas court must (1) determine what arguments or theories supported or could have supported the state court's decision; and then (2) ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of the United States Supreme Court. <u>Id.</u> at 786.



In this case, as argued by the respondent, the South Carolina Supreme Court could reasonably have found that the Belcher issue was not properly preserved for appellate review. Although Herring argues that his objection to the trial court's decision not to charge the jury that "[o]ne who causes the death of another by the negligent use of a deadly weapon or instrumentality may be convicted of involuntary manslaughter" properly preserved this issue for review, this objection did not pertain to the propriety of the trial court's charge regarding murder. Herring did not challenge the trial court's murder charge, which included the implied malice instruction. In fact, with regard to the murder charge, trial counsel stated, "[w]e're fine with that." (ECF No. 5-12 at 35.) The Belcher issue is a distinct one from the involuntary manslaughter instruction the trial court declined to charge. The South Carolina Supreme Court could reasonably have determined that counsel's objection to the *exclusion* of a requested charge on involuntary manslaughter was not adequate under state issue preservation rules to encompass the *inclusion* of an instruction with regard to implied malice in the murder charge. See State v. Adams, 504 S.E.2d 124, 126-27 (S.C. Ct. App. 1998) (holding that the issue of whether the State presented sufficient evidence of intent to accomplish a sexual battery was not preserved for review, in part because the precise argument was not raised to and ruled upon by the trial court as the defendant merely argued generally that evidence did not rise to the level of reasonable doubt). Accordingly, Herring has failed to show that there was no reasonable basis for the state court to deny relief. Further, he cannot show that there is no possibility that fairminded jurists could disagree that a failure to apply the Belcher decision retroactively under the circumstances in this case violates a holding of a prior decision of the United States Supreme

Court.[9]  See Harrington, 131 S. Ct. at 784, 786; see also American Trucking Assns., Inc. v. Smith, 496 U.S. 167, 177-78 (1990) (plurality opinion, O'Connor, J.) (observing that "[t]he determination whether a constitutional decision of this Court is retroactive . . . is a matter of federal law.  When questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions.").

### 4.    Recusal

Herring next argues that he was also denied his right to due process when the Honorable Jean Hoefer Toal, Chief Justice of the South Carolina Supreme Court, denied Herring's motion to recuse herself from considering Herring's direct appeal.  The basis of Herring's motion was that one of the issues Herring was presenting on direct appeal challenged the authority of the Chief Justice to issue an administrative order authorizing law enforcement officers to obtain warrants in Richland County by telephone and facsimile transmissions without personally appearing before the magistrate.  (ECF No. 1-8.)  The Chief Justice denied Herring's motion.  (ECF No. 1-9.)

The United States Supreme Court has stated that "[u]nder our precedents there are objective standards that require recusal when 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.' "  Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 129 S. Ct. 2252, 2257 (2009) (quoting Withrow v. Larkin, 421 U.S. 35, 47 (1975)).  Further, "[i]t is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'  As the Court has recognized, however, 'most matters relating to judicial disqualification

---

[9] As pointed out by the respondent, the Belcher case constituted a "clear break" from *prior state law*; it did not announce a new federal constitutional rule of criminal procedure.  Consequently, even if the Belcher issue were properly preserved, the United States Supreme Court's decision in Griffith would not necessarily govern the retroactivity analysis.  (See Respt.'s Mem. Supp. Summ. J. at 47-50 n.11, ECF No. 16 at 47-50) (examining case law discussing the limitations on the application of Griffith's requirement of retroactivity to new rules of state law).



[do] not rise to a constitutional level.' " Id. at 2259 (internal citations omitted). Moreover, constitutionally required recusal has been found in cases that "dealt with extreme facts that created an unconstitutional probability of bias that 'cannot be defined with precision.' " Id. at 2265-66 (quoting Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 822 (1986)).

In this case, Herring relies on the following statement by the United States Supreme Court:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that 'Every procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law.' Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.'

In re Murchison, 349 U.S. 133, 136 (1955) (internal citations omitted and alterations in original). The Murchison case involved the denial of a motion to recuse a judge presiding over a show-cause hearing in a criminal contempt proceeding. The judge had been the so-called "one-man judge-grand jury" under Michigan law in the secret proceedings out of which the contempt charges arose. Id. at 134-35. The Supreme Court held that "it was a violation of due process for the 'judge-grand jury' to try these petitioners." Id. at 139.

Upon review of the facts and circumstances in this matter, the court finds that Herring has failed to demonstrate that the state court unreasonably misapplied clearly established federal law in denying Herring's motion for recusal. The situation in this case is unlike that in Murchison. Here, Herring alleges partiality because the Chief Justice issued, approximately eight years before Herring's appeal, the administrative order that Herring was attacking. This alleged bias stemming



from a justice's ostensible interest in defending a position or rule she previously adopted is not the type of "interest in the outcome" proscribed by <u>Murchison</u> in the context of criminal contempt proceedings. Rather, as the respondent points out, Herring's ground is more akin to a party requesting an appellate judge to recuse in an appeal arguing against precedential authority which that judge had previously authored. Herring has failed to show that the purported interest by the Chief Justice in this issue posed an objective risk of actual bias or prejudgment that would implicate the Due Process Clause. <u>See</u> <u>Caperton</u>, 129 S. Ct. at 2263.[10] Accordingly, the court finds that Herring has failed to demonstrate this case was one of those "rare instances" or consisted of "extreme facts" that would constitutionally mandate recusal. <u>See</u> <u>id.</u> at 2265, 2267 ("The Due Process Clause demarks only the outer boundaries of judicial disqualifications. Congress and the states, of course, remain free to impose more rigorous standards for judicial disqualification than those we find mandated here today.") (internal quotation marks and citation omitted); <u>see</u> <u>also</u> <u>id.</u> at 2268 (observing that "[w]e have thus identified only two situations in which the Due Process Clause requires disqualification of a judge: when the judge has a financial interest in the outcome of the case, and when the judge is presiding over certain types of criminal contempt proceedings") (dissenting opinion, Roberts, C.J.).

### 5.     Fourth Amendment Claims

Finally, Herring argues that he was denied his right under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures. Herring argues

---

[10] Moreover, the court observes that although there was a concurring opinion in Herring's direct appeal, all five of the Justices appear to have agreed that the SLED search warrant, which was the warrant obtained via the procedures permitted by the administrative order, was proper. (<u>See</u> ECF No. 1-10 at 10-12, 15.) Thus, it appears that recusal of Chief Justice Toal would not have altered the result of Herring's appeal in any event.



extensively in his Amended Petition and his response in opposition to summary judgment the reasons that the search warrants violated his rights under the Fourth Amendment. However, a petitioner's allegations of a violation of the Fourth Amendment as a freestanding claim cannot constitute grounds for habeas relief, unless he demonstrates that he did not have a full and fair opportunity to litigate this claim in state court. See Stone v. Powell, 428 U.S. 465, 494 (1976) (concluding that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial"); Doleman v. Muncy, 579 F.2d 1258, 1265 (4th Cir. 1978) (applying Stone and holding that where a state court provides a mechanism under state practice to litigate Fourth Amendment claims, then the court "need not inquire further into the merits of the petitioner's case . . . unless the prisoner alleges something to indicate his opportunity for a full and fair litigation of his Fourth Amendment claim or claims was in some way impaired"). In this case, Herring was provided with an opportunity to present his Fourth Amendment claims by a motion to suppress at the trial court and thereafter on appeal to the South Carolina Supreme Court. Although Herring argues that the Chief Justice's denial of his motion to recuse denied him the opportunity to fully and fairly litigate his claim, for the reasons discussed above, the court finds this argument to be without merit. Therefore, having determined that Herring was provided an opportunity for full and fair litigation of his Fourth Amendment claims in accordance with Stone and Doleman, the court "need not inquire further into the merits of [Herring's] case." Doleman, 579 F.2d at 1265. Accordingly, Herring is not entitled to federal habeas corpus relief on this ground.



## RECOMMENDATION

For the reasons stated above, the court recommends that the respondent's motion (ECF No.

17) be granted and Herring's Petition be denied.

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

January 25, 2012
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).