IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| H. Dewain Herring, )<br>)<br>Petitioner, )<br>)<br>vs. )<br>)<br>Robert M. Stevenson, III, Warden of )<br>Broad River Correctional Institution, )<br>)<br>Respondent. )<br>) | C/A No. 0:11-160-MBS-PJG<br><br>**OPINION AND ORDER** |

Petitioner H. Dewain Herring is a prisoner in the custody of the South Carolina Department of Corrections who currently is housed at the Broad River Correctional Institution. Petitioner, represented by counsel, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting that he is being held in custody unlawfully. Petitioner seeks relief in the form of vacatur of his conviction.

This matter is before the court on Respondent's[1] motion for summary judgment filed April 29, 2011. ECF No. 17. Petitioner filed a response in opposition on June 15, 2011. ECF No. 26. In accordance with 28 U.S.C. § 636(b)(1) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Paige J. Gossett for pretrial handling. The Magistrate Judge issued a Report and Recommendation on January 25, 2012, in which she recommended that summary judgment be granted. ECF No. 28. On February 13, 2012, Petitioner filed objections to the Report and Recommendation. ECF No. 29.

---

[1] Petitioner initially named William R. Byars, Jr., director of the South Carolina Department of Corrections, as an additional respondent. Byars was previously terminated as a party because he is not Petitioner's immediate custodian. ECF No. 8. Although Petitioner subsequently named Byars in his amended petition, the court construes the previous order as terminating Byars once again.

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The court is charged with making a *de novo* determination of any portions of the Report and Recommendation to which a specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

## I. BACKGROUND

On February 15, 2006, Petitioner was indicted in Richland County, South Carolina, for murder and pointing and/or presenting a firearm. ECF No. 4-1 at 19 & 21. Prior to trial, Petitioner moved to exclude various evidence seized during three searches of his home. ECF No. 5-15 at 31; *see* ECF No. 5-16 at 1-24. On May 21, 2007, Petitioner was convicted by a jury of both offenses. *Id.* at 16-17. Petitioner was sentenced to thirty years imprisonment for murder and five years imprisonment for pointing and/or presenting a firearm, to be served concurrently. *Id.* Petitioner filed a notice of appeal on May 29, 2007. ECF No. 1-2 at 1. On Petitioner's motion, the South Carolina Supreme Court certified the case for review on February 5, 2009, transferring jurisdiction from the appellate court. *See* ECF No. 1-3 at 1; S.C. App. Ct. R. 204(b).

Petitioner raised the following issues in his appeal to the South Carolina Supreme Court:

1. Did the trial court err in denying the defense motions to suppress the three searches of appellant's residence and the fruits of those searches?

2. Did the trial court abuse its discretion in allowing lay witnesses to give their opinion of what could be seen on the video, when those witnesses did not personally observe the actual events depicted in that portion of the video?

3. Did the trial court abuse its discretion in denying the defense mistrial motion

2

>     based on the admission of improper lay opinion testimony?
>
> 4. Did the trial court commit reversible error in denying the requested charge on accident?
>
> 5. Did the trial court commit reversible error in denying the requested charges on involuntary manslaughter based on negligent use of a deadly weapon?
>
> 6. Did the trial court commit reversible error in granting the State's request to charge based on *State v. Mouzon*?
>
> 7. Did the trial court err in denying the motion for directed verdict with respect to the charge of pointing and presenting a firearm?
>
> 8. Was the cumulative prejudice that resulted from all the erroneous rulings such that appellant is entitled to a new trial?

ECF No. 1-4 at 7. On June 16, 2009, Petitioner filed a motion to recuse Chief Justice Jean Toal. ECF No. 1-8. Petitioner explained that he was challenging the validity of a search warrant that was obtained by telephone and fax pursuant to an administrative order issued by Chief Justice Toal, as well as the validity of the order itself. ECF No.1-8 at 3-4. Petitioner's motion was denied on June 18, 2009. ECF No. 1-9.

The South Carolina Supreme Court heard oral arguments on June 23, 2009. ECF No. 1-10 at 1. On December 21, 2009, the supreme court affirmed Petitioner's conviction and sentence by published opinion. ECF No. 1-10; *State v. Herring*, 692 S.E.2d 490 (S.C. 2009). On January 20, 2010, Petitioner filed a petition for rehearing, requesting that the supreme court reconsider its ruling and apply the holding of *State v. Belcher*, 685 S.E.2d 802 (S.C. 2009), which was issued on October 12, 2009, between the date of the oral argument and the ruling in Petitioner's case. ECF No. 1-11. The petition for rehearing also restated Petitioner's request that Chief Justice Toal recuse herself from participation in the case. *Id.* The supreme court denied the petition for rehearing on May 14, 2010, and remitted the case to the lower court. ECF No. 1-12; ECF No. 1-

13.

The South Carolina Supreme Court summarized the facts of Petitioner's case as follows:

Herring was charged with the January 29, 2006 shooting of an employee of Chastity's Gold Nightclub (Chastity's), a strip club in Columbia. The facts giving rise to the shooting are as follows.

After golfing in Aiken with friends on the day of January 28, 2006, at which he had consumed numerous beers, Herring stopped by a bar for a few drinks on the way home, and then returned home around 7:30 p.m. Herring had a couple more drinks at his home with a golfing buddy before the friend left. Herring laid down intending to go to sleep, but got up and decided to go a Forest Acres restaurant. When the restaurant was closed, Herring changed his mind and went to Platinum Plus, a Columbia strip club. He had a drink and paid a dancer for a lap dance and left Platinum Plus. On his way home, he decided to stop by Chastity's on River Drive; he arrived shortly after 11:00 p.m. According to Herring, he ordered a drink at the bar, but he has very little recall of any events for several hours thereafter.

According to witnesses and employees of Chastity's, Herring purchased a drink and paid for a $30.00, three minute lap dance from a dancer named Mia. After the lap dance, Herring paid Mia for a $300 dance in what was known as the Champagne room.

Mia took Herring to the Champagne room and told him to wait while she went to freshen up. A bouncer, Carl Weeks, went to check on Herring a few minutes later and found him naked and masturbating on the sofa. The bouncer told Herring he could not do that and told him he would have to leave. When Herring did not move, the bouncer got the manager, John Johnson (John John). When they returned, Herring was dressed. Weeks told Herring he would either have to leave, or they would call police and have him arrested for solicitation of prostitution. According to Weeks, Herring responded, "No. I will fucking shoot you." John John and a bouncer named Donnie Hawkins escorted Herring to the front door at 11:57 p.m. John John walked outside with Herring and used a two-way radio to call Herring's license plate number out to Weeks, who was standing in the doorway, as Herring drove away. Weeks and Hawkins watched as Herring backed up his black SUV, and fumbled with his glove compartment with his right hand. Herring slowly pulled away, putting down the passenger side windows as he went. Hawkins, Weeks and John John had just gone inside when they saw Herring's vehicle coming back down River Drive toward Chastity's. According to Hawkins, John John was right inside the door. Hawkins saw a flash of light come from the side of the vehicle, and heard John John say, "Oh shit!" John John fell to the floor, having been hit in the left ear by a bullet which came

through the front door. He died a short while later at the hospital.

> Upon arriving at the scene of Chastity's, police were given Herring's license tag number, which was registered to his office address in Columbia. Police patrolled the office parking lot, but did not find the vehicle. They then determined Herring's home address and went there at 2:10 a.m. on January 29, 2006. A police officer, seeing a light on in the garage, peeked in the garage window to see if the suspect was there. Although the suspect was not there, the officer did see the vehicle, which they realized was Herring's. They knocked on the door and rang the doorbell several times and, receiving no answer, they returned to the police station and obtained a search warrant for the home.
>
> Police went back to Herring's residence at approximately 4:00 a.m. to execute the search warrant. They rang the doorbell several times but received no answer. They entered forcibly, announcing they were police with a search warrant. Officer Linfert testified that he saw Herring in the hallway and recognized him from the photo on his driver's license. Linfert told Herring to get down on the ground, but Herring ran back down the hall toward a bedroom. He followed Herring to the bedroom, and saw Herring pull a gun from a nightstand and point it in his direction. Officer Linfert yelled at him to drop the gun and then fired one shot at him. Other officers also opened fire, and Herring was hit in the arm. Herring called 9–1–1 and told them he believed there were intruders in his home. After talking with the 9–1–1 operator, Herring surrendered upon realizing the "intruders" were indeed police officers.
>
> Herring initially told police he had not left the house after returning home from Aiken; he did not recall going to Chastity's. When police told him of the video tape which showed him entering and leaving Chastity's, he remembered only being at the bar, having a drink, and a gunshot firing; the next memory he had was of police bursting into his home. He subsequently began remembering more details, such as paying for a lap dance from a light skinned black woman.
>
> Bullet fragments removed from John John's head conclusively matched a .357 Magnum Ruger owned by Herring; the Ruger was found under some clothing in his bedroom closet during a SLED search of the home. Gunshot residue was found on the passenger side of Herring's vehicle. A jury convicted Herring of murder and pointing and presenting a firearm.

*State v. Herring*, 692 S.E.2d 490, 492-93 (S.C. 2009) (footnotes omitted).

Petitioner filed the within § 2254 petition on October 21, 2010. ECF No. 1. Petitioner asserts the following ground for relief:

1. Petitioner's Due Process right to a fair trial was denied because the jury instructions equated the mental state required for a conviction of murder with the same mental state necessary for the lesser included offense of involuntary manslaughter, thereby allowing the jury to find Petitioner guilty of murder even if Petitioner possessed the mitigating state of mind for involuntary manslaughter.

2. Petitioner's Due Process rights to a fair trial were denied because the jury was not instructed on the defense of accident nor provided instructions pertaining to the negligent use of a firearm.

3. Petitioner was denied his right to Due Process as a result of the South Carolina Supreme Court's decision to refuse to apply its decision in *State v. Belcher*, . . . 685 S.E.2d 802 (2009) to the Petitioner as required by *Griffith v. Kentucky*[,] 479 U.S. 314 (1987).

4. Petitioner was denied his right to Due Process as a result of the refusal of the Chief Justice of the South Carolina Supreme Court to recuse herself from participating in the appeal from [Petitioner's] conviction which necessarily involved a direct review of the legality of the Chief Justice's Administrative Order.

5. Petitioner was denied his right to be free from unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution and Petitioner was further deprived of his right to fully and fairly litigate this Fourth Amendment claim in the South Carolina state courts as a result of the refusal of the Chief Judge to recuse herself from participation and the Court's refusal to apply the correct and controlling legal standard applicable to Fourth Amendment claims.

ECF No. 13 at 7. The petition is governed by the terms of 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which became effective on April 24, 1996.

## II. STANDARD OF REVIEW

To prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) he is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The facts and any inferences drawn from the facts should be viewed in a light most favorable to

6

the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324.

An application for a writ of habeas corpus with respect to a claim that was adjudicated on the merits in state court proceedings cannot be granted unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A determination of a factual issue made by a state court is presumed to be correct. Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

A decision is "contrary to" clearly established federal law if it either applies a legal rule that contradicts prior Supreme Court holdings or reaches a conclusion different from that of the Supreme Court "on a set of materially indistinguishable facts." *Buckner v. Polk*, 453 F.3d 195, 198 (4th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). A decision is an "unreasonable application" of clearly established federal law if it "unreasonably applies" a

Supreme Court precedent to the facts of the petitioner's claim. *Id.* (quoting *Williams*, 529 U.S. at 413). The court's "review is . . . deferential because [the court] cannot grant relief unless the state court's result is legally or factually unreasonable." *Bell v. Jarvis*, 236 F.3d 149, 163 (4th Cir. 2000) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)).

## III.  **DISCUSSION**[2]

A.  **Jury Instructions for Murder and Involuntary Manslaughter**

The trial judge instructed the jury that because Petitioner was charged with murder, the prosecution must prove that he "killed another with malice aforethought." ECF No. 5-14 at 35. The trial judge instructed the jury that:

> Malice is defined in the law as a term of art; that is, a technical term importing wickedness, excluding just cause or legal excuse. An old South Carolina case says that malice does not necessarily impart ill will towards the individual injured but signifies rather a general malignant recklessness of the lives and safety of others or a condition of mind which shows a heart regardless of social duty and fatally bent on mischief.

*Id.* at 35-36.[3] The trial judge also instructed the jury on the lesser included offense of involuntary manslaughter, stating that:

> Involuntary manslaughter is the killing of another without malice and unintentionally while engaged in either an unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm; or, a lawful act with reckless disregard for the safety of others. . . . Recklessness is a conscious failure to use ordinary care. A reckless disregard for the safety of others means that you [are] not interested in the consequences of your acts or the rights and safety of

---

[2] Petitioner filed objections to the Magistrate Judge's findings on all of his claims. Although the court will conduct a *de novo* review of all of Petitioner's objections, the court shall address all but one of Petitioner's claims without reference to the Report and Recommendation.

[3] The "old South Carolina case" is *State v. Mouzon*, 99 S.E.2d 672 (S.C. 1957). *See* ECF No. 16 at 21.

8

others.

*Id.* at 38-39.

Before the South Carolina Supreme Court, Petitioner argued that the *Mouzon* language concerning "general malignant recklessness" constituted reversible error for several reasons. Petitioner argued that the prosecution's sole theory of the case was that he aimed the gun and fired at the door with actual malice, while the defense theory of the case was that he accidentally or recklessly discharged the gun without aiming at the door. ECF No. 1-4 at 45. Accordingly, Petitioner argued, there was no evidence of "some middle ground mental state of 'super recklessness' that would warrant a charge of the *Mouzon* language." *Id.* Petitioner further argued that South Carolina Code § 16-3-60, which defines the mental state for involuntary manslaughter as "reckless disregard for the safety of others," had supplanted or overruled the common law principle stated in *Mouzon* that "recklessness with regard to the lives and safety of others could rise to the level of malice to support a conviction of murder." *Id.* at 46.

Petitioner also argued that the crime of murder based on the *Mouzon* recklessness standard was unconstitutionally vague because "[t]here is no articulable means by which to differentiate between the recklessness required for involuntary manslaughter and that which would elevate an offense to murder." ECF No. 1-4 at 47. Finally, Petitioner argued that the *Mouzon* charge unconstitutionally shifted the burden of proof with respect to his mental state because "if the jury accepted the defense evidence [which] established that [he] acted with recklessness, at most," the burden would be shifted onto him "to prove that the recklessness involved in this case did not rise to the inarticulable, undefined standard of recklessness that could be deemed malice." *Id.* The South Carolina Supreme Court summarily rejected

9

Petitioner's arguments, citing to an earlier case upholding the *Mouzon* instruction and an earlier case holding that "in determining prejudice[] from jury instructions, [a] court must find that, viewing the charge in its entirety and not in isolation, there is a reasonable likelihood that the jury applied the instruction in a way that violates the Constitution." ECF No. 1-10 at 14 n.7.

A petitioner alleging that his right to due process was violated by an improper jury instruction "must show both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (quotations omitted). "In making this determination, the jury instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Id.* at 191 (quotation omitted). "[T]he pertinent question is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (quotation omitted).

Contrary to Petitioner's assertion, the jury instructions did not equate the mental state required for murder with that required for involuntary manslaughter. The trial court instructed the jury that one who unintentionally kills another while engaged in "a lawful act with reckless disregard for the safety of others" is guilty of involuntary manslaughter. ECF No. 5-14 at 38-39. On the other hand, the trial court instructed the jury that malice "signifies . . . a general malignant recklessness of the lives and safety of others or a condition of mind which shows a heart regardless of social duty and fatally bent on mischief." *Id.* at 35-36. A "malignant" recklessness suggests a state of mind significantly more culpable and destructive than "mere" recklessness. This is especially true when the instructions imply that a "malignant recklessness"

is synonymous with "a condition of mind which shows a heart regardless of social duty and fatally bent on mischief."

Petitioner, focusing on the disjunctive "or," contends that the instruction defines "two separate and alternative means of proving malice." ECF No. 26 at 6-7. It is immaterial whether the two descriptions are considered to be "two separate and alternative means of proving malice" or simply two phrases attempting to express the same indefinite concept. The question is whether there is a reasonable likelihood that the jurors, hearing the "malignant recklessness" language in the context in which it was presented, understood it to mean that Petitioner could be convicted of murder based on the "simple" recklessness associated with involuntary manslaughter.

The adjective "malignant," as well as the description of malice as involving "a heart regardless of social duty and fatally bent on mischief," distinguished this more culpable recklessness from ordinary recklessness. Petitioner's defense at trial was that he accidentally fired his gun while taking it from his glove compartment. The court finds that it is not reasonably likely that, if the jurors believed Petitioner's theory, they could have considered such an accident to be "malignant recklessness." Accordingly, the South Carolina Supreme Court's holding that these jury instructions did not violate Petitioner's right to due process was not an unreasonable application of clearly established federal law.

**B.      Jury Instructions on Accident and Negligent Use of a Firearm**

Petitioner's trial counsel requested that the trial court instruct the jury on accident, as follows:

> "If it [is] shown that the killing was unintentional; that it was done while the [defendant] was engaged in a lawful enterprise, and was not the result of

negligence, the homicide will be excused [as] accident." The defendant does not bear the burden of proving accident; rather, the State must prove beyond a reasonable doubt that the defendant acted with the intent to kill the deceased.

ECF No. 5-16 at 29. The trial judge denied this charge as inapplicable to the facts of the case because "the defense of accident is only allowable when the defendant is involved and engaged in a lawful act." ECF No. 5-13 at 7-8. Trial counsel also requested that the involuntary manslaughter charge include a statement that "[o]ne who causes the death of another by the negligent use of a deadly weapon or instrumentality may be convicted of involuntary manslaughter." ECF No. 5-16 at 25. Additionally, trial counsel requested that the involuntary manslaughter charge include the following:

> How do you, as jurors, think that a man of average sense in this position would handle a dangerous weapon or implement, under given circumstances generally? Then, under the testimony of the case you are trying, has the state shown beyond a reasonable doubt that the defendant was guilty of negligence–that is, he did act in that manner with the dangerous weapon or implement as a man of average sense and disposition, under the circumstances which the testimony shows to have existed in the case–he did act in that way, and, as a result of that, he did inflict the mortal wound, as alleged in the indictment, which caused the death of the defendant, as charged, if you find it so, then that will be a case of [involuntary] manslaughter.

ECF No. 5-16 at 27. The trial judge did not give either instruction to the jury.

Before the South Carolina Supreme Court, Petitioner argued that the trial court erred in refusing to give the accident charge because evidence introduced at trial showed that Petitioner was engaged in a lawful activity at the time of the shooting. ECF No. 1-4 at 42. Specifically, Petitioner noted that he had a valid concealed weapon permit and that his theory at trial was that the gun accidentally discharged while being transferred from the glove compartment of his car. *Id.* at 42-43. Petitioner also argued that the trial court erred in refusing to instruct the jury that negligent use of a deadly weapon constitutes involuntary manslaughter because this was a

correct statement of the law, and because it was necessary to counterbalance the jury instruction stating that "[i]f a person using a deadly weapon deliberately and intentionally without just cause or legal excuse takes the life of another, malice may be inferred." *Id.* at 43-44; ECF No. 5-14 at 37.

The South Carolina Supreme Court summarily rejected Petitioner's argument as to the accident instruction, citing to an earlier case holding that "for homicide to be excusable on the ground of accident, it must be shown that the killing was unintentional, the defendant was acting lawfully, and due care was exercised in the handling of the weapon." ECF No 1-10 at 14 n.7. The supreme court also cited an earlier case holding that "to warrant reversal, [the] trial court's refusal to give [a] requested charge must be both erroneous and prejudicial to [the] defendant." *Id.* The supreme court similarly rejected Petitioner's argument as to involuntary manslaughter with a deadly weapon, citing an earlier case holding that "failure to give requested jury instructions is not prejudicial error where instructions given adequately cover the law." *Id.*

Regardless of whether any evidence introduced at trial supported Petitioner's theory that the shooting constituted an excusable accident, there is no constitutional error resulting from the trial court's refusal to give the requested instruction on accident. As stated above, an erroneous or omitted jury instruction violates due process only if there is a reasonable likelihood that the jury convicted a defendant without finding every necessary element to be proven beyond a reasonable doubt. Petitioner's requested instruction stated that a killing is excusable if it is unintentional, occurring during the course of a lawful activity, and not the result of negligence. However, the trial judge instructed the jury that malice, an essential element of murder, requires conduct that is willful, deliberate, intentional, or at least done in "a general malignant

recklessness of the lives and safety of others or a condition of mind which shows a heart regardless of social duty and fatally bent on mischief." ECF No. 5-14 at 35-36. If the jurors believed that the shooting occurred unintentionally while Petitioner was engaged in a lawful activity and not behaving negligently, they could not have convicted Petitioner of murder under the instructions given.

Similarly, the trial court did not commit constitutional error in refusing to give an instruction stating that a defendant who causes the death of another by the negligent use of a deadly weapon may be convicted of involuntary manslaughter. The trial court correctly and adequately instructed the jury on involuntary manslaughter, and these instructions would apply to the use of a deadly weapon in "reckless disregard for the safety of others." ECF No. 5-14 at 38-39. Furthermore, there was no need to "balance" the instruction stating that "[i]f a person using a deadly weapon deliberately and intentionally without just cause or legal excuse takes the life of another, malice may be inferred" with an instruction stating that the use of a deadly weapon does not necessarily imply malice. *Id.* at 37. The instruction does not suggest that the use of a deadly weapon necessarily implies malice, but rather states that malice may be inferred if this use was "deliberate[] and intentional[] without just cause or legal excuse." The South Carolina Supreme Court's holding that the trial court's omission of Petitioner's requested jury instructions did not violate his right to due process was not an unreasonable interpretation of clearly established federal law.

**C.     Application of *State v. Belcher***

In *State v. Belcher*, the South Carolina Supreme Court considered the long-accepted jury instruction stating that "malice may be inferred from the use of a deadly weapon." *Belcher*, 685

S.E.2d at 804.  The supreme court held that this instruction "is no longer good law in South Carolina where evidence is presented that would reduce, mitigate, excuse or justify the homicide." *Id.* at 804.  The supreme court, noting that malice necessarily includes the absence of justification, excuse, or mitigation, described this instruction as "only a half-truth." *Id.* at 808.  For example, if a defendant intentionally uses a deadly weapon in self-defense, "[t]he absence of justification, excuse, or mitigation cannot be inferred from the use of a deadly weapon standing alone." *Id.*  The supreme court held that its ruling would be "effective in this case and for all cases which are pending on direct review or not yet final where the issue is preserved." *Id.* at 810.

In his petition for rehearing, Petitioner argued that the South Carolina Supreme Court erred in failing to apply the holding of *Belcher*, which was decided after oral arguments but before the ruling in his case.  ECF No. 1-11 at 15-17.  However, the jury instruction given at Petitioner's trial differs significantly from the instruction at issue in *Belcher*.  The trial judge instructed the jury that "[i]f a person using a deadly weapon deliberately and intentionally without just cause or legal excuse takes the life of another, malice may be inferred." ECF No. 5-14 at 37.  Rather than simply stating that malice may be inferred from "the use of a deadly weapon," the instruction also informed the jurors that Petitioner must have "deliberately and intentionally . . . take[n] the life of another" and that this must have been "without just cause or legal excuse."  This language adequately answers the criticism put forth in *Belcher* by forbidding the jury to infer malice from the use of a deadly weapon if there was just cause or a legal excuse.  More importantly, there is no reasonable chance that the instruction given permitted the jury to draw an improper inference of malice or shifted any burden onto Petitioner.  Petitioner's theory

15

at trial was that he had accidentally or recklessly discharged the gun, and the "deliberate[] and intentional[]" language would not permit an inference of malice if the jury believed this theory. Because the holding of *Belcher* is not relevant to Petitioner's case, there can be no constitutional error.

**D.     Recusal of Chief Justice Toal**

At trial and on appeal, Petitioner argued that a search of his home conducted pursuant to a warrant was illegal because the warrant had been obtained by a State Law Enforcement Division ("SLED") officer over the telephone and by fax, without the officer's personal appearance before a magistrate and without his affidavit being sworn before the magistrate. ECF No. 1-8 at 3. Petitioner contended that the magistrate instructed the officer to follow this procedure, which was approved in a July 26, 2001 order by Chief Justice Toal. *Id.* Petitioner argued that Chief Justice Toal's order was contrary to the South Carolina Constitution, to various South Carolina statutes, and to holdings of the South Carolina Supreme Court. *Id.* at 3-4. Petitioner maintained that Chief Justice Toal's recusal was required by due process in order "to ensure a fair and impartial hearing and disposition of [his] challenge to the authority of the Chief Justice to issue the order allowing the telephone and facsimile warrant procedure." *Id.* at 4. Petitioner's request for recusal was denied without comment. ECF No. 1-9.

The Magistrate Judge found that the South Carolina Supreme Court had not unreasonably misapplied clearly established federal law in denying Petitioner's motion for recusal. ECF No. 28 at 21. The Magistrate Judge distinguished *In re Murchison*, 349 U.S. 133 (1955), the primary case cited by Petitioner, in which the Supreme Court held that a judge allowed under state law to conduct secret, one-person grand jury proceedings could not act as the judge in a criminal

contempt action arising from these proceedings. The Supreme Court found that because the judge played a significant role in the "accusatory process," he could not "be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused." *Id.* at 137. The Magistrate Judge found that "alleged bias stemming from a justice's ostensible interest in defending a position or rule she previously adopted is not the type of 'interest in the outcome' proscribed by *Murichson*." ECF No. 28 at 21-22. Rather, the Magistrate Judge found that the situation is more akin to a litigant requesting recusal by an appellate judge in an appeal arguing against precedential authority previously authored by that judge. *Id.* at 22. The Magistrate Judge found that Petitioner had not demonstrated that "this case was one of those 'rare instances' or consisted of 'extreme facts' that would constitutionally mandate recusal." *Id.* (citing *Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252, 2265, 2267 (2009)). The Magistrate Judge further noted that the South Carolina Supreme Court unanimously agreed that the administrative order was proper, and that Chief Justice Toal's recusal apparently would not have affected the result of Petitioner's appeal. *Id.*

      This court agrees with the Magistrate Judge and finds that Chief Justice Toal's participation in Petitioner's case did not "pose[] such a risk of actual bias or prejudgment that [it] must be forbidden if the guarantee of due process is to be adequately implemented." *Caperton*, 129 S. Ct. at 2263 (quotation omitted). Although Petitioner argues that the Chief Justice acted as "a judge in [her] own case" and "as a judge of her own conduct," such a characterization is not accurate. Rather, the Chief Justice was being asked to reconsider her earlier position regarding matters of legal interpretation. Although Chief Justice Toal was required to construe the authority of the chief justice under the South Carolina Constitution, this is not the sort of

17

"personal interest" in the outcome that the Supreme Court has found to be unconstitutional.

Furthermore, even assuming that Chief Justice Toal's participation in Petitioner's case was improper, habeas relief would not be available in this situation. Contrary to Petitioner's assertion, the Supreme Court has never "explicitly ruled that prejudice is presumed when a judge who should be disqualified from sitting on a case nevertheless participates in the ruling." ECF No. 29 at 7. The first case cited by Petitioner, *Murichson*, involved a trial judge who presided over a contempt hearing when he should have recused himself. *See Murichson*, 349 U.S. at 134-136. The other case cited by Petitioner, *Caperton*, involved a 3-2 decision by a state supreme court where the interested justice was in the majority. *See Caperton*, 129 S. Ct. at 2256. However, the Supreme Court has never considered whether participation in a ruling by a judge who should be disqualified necessarily taints the ruling if that judge's vote is not outcome-determinative.[4] In the absence of clearly established federal law, as stated by the Supreme Court, habeas relief may not be granted.

## E. Fourth Amendment Claims

Petitioner argues that the South Carolina Supreme Court unreasonably found that his Fourth Amendment right to be free from unreasonable searches and seizures was not violated by various police actions. Petitioner recognizes that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or

---

[4] *See, e.g., Caperton*, 129 S. Ct. at 2269-70 (Roberts, C.J., dissenting) (noting that, among the unanswered questions to be answered by later courts, was the question: "Must the judge's vote be outcome determinative in order for his non-recusal to constitute a due process violation?").

seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). Accordingly, Plaintiff argues that the participation of Chief Justice Toal denied him a full and fair opportunity to litigate his Fourth Amendment claims. For the reasons explained above, the court rejects this argument. Plaintiff further argues that the state court's "willful refusal to apply the correct and controlling legal standard" deprived him of a full and fair opportunity to litigate his Fourth Amendment claims. ECF No. 29 at 8. If a habeas court finds that a petitioner had a procedural mechanism available to raise Fourth Amendment claims in state court and that this opportunity was not impaired, it need not inquire further into the merits of these claims. *Doleman v. Muncy*, 579 F.2d 1258, 1265 (4th Cir. 1978). In this case, Petitioner, represented by skilled counsel, raised his Fourth Amendment claims by motion in the trial court, had a suppression hearing, and ultimately had these claims resolved by published opinion of the South Carolina Supreme Court. This court is satisfied that Petitioner had a full and fair opportunity to present his claims, and will not consider the merits of these claims further.

**F.     Factual Findings**

Petitioner objects that "the Magistrate Judge in her summary of evidence simply adopt[ed] the factual recitation from the South Carolina Supreme Court's opinion and fail[ed] to consider material exculpatory evidence."[5] ECF No. 29 at 1. Petitioner lists various facts in this recitation that he asserts are contradicted by the trial record and various allegedly exculpatory facts presented at trial that are not mentioned. *Id.* at 1-3. However, none of these discrepancies is relevant to this court's resolution of Petitioner's claims. Furthermore, Petitioner has not alleged that the jury's verdict or the South Carolina Supreme Court's opinion were "based on an

---

[5]     This court has cited the same factual recitation as background.

unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). Accordingly, this objection is without merit.

## IV. CONCLUSION

The court has carefully reviewed the record and concurs in the recommendation of the Magistrate Judge. Defendant's motion for summary judgment is granted and the case dismissed.

## V. CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases, as effective December 1, 2009, provides that the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A prisoner satisfies this standard by demonstrating that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. *Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003); *Rose v. Lee*, 252 F.3d 676, 683-84 (4th Cir. 2001). The court concludes that Petitioner has not made the requisite showing. Accordingly, the court denies a certificate of appealability.

**IT IS SO ORDERED**.

s/ Margaret B. Seymour
Chief United States District Judge

Columbia, South Carolina

March 19, 2012